**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Raymond G. Boyle,                          :        Case No. 1:14CV1294
                                           :
      Plaintiff,                       :        Judge Sara Lioi
                                           :
vs.                                        :
                                           :        **REPORT AND**
Carolyn W. Colvin                          :        **RECOMMENDATION**
Commissioner of Social Security            :
                                           :
      Defendant.                       :
                                           :

## I.  INTRODUCTION

This case was referred to the undersigned Magistrate Judge for Report and Recommendation pursuant to Local Rule 72.2(b)(2).  Plaintiff Raymond G. Boyle ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant") final determination denying his claim for Social Security Income ("SSI") and Disability Income Benefits ("DIB") under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423, 1381, *et seq*., and § 405(g).  Pending are briefs on the merits filed by both parties (Docket Nos.13 & 14) and Plaintiff's Reply (Docket No. 15).  For the reasons set forth below, the Magistrate recommends that the decision of the Commissioner be reversed and that this case be remanded for further proceedings consistent with this Report and Recommendation.

## II. PROCEDURAL BACKGROUND

On August 29, 2011, Plaintiff filed applications for SSI and DIB, alleging disability beginning June 7,

2011 (Docket No. 12, pp. 162-168; 169-173 of 452).  Plaintiff's claims for both SSI and DIB were denied on

January 4, 2012, and upon reconsideration on April 10, 2012 (Docket No. 12, pp. 105-110; 116-128 of 452).

Plaintiff filed a written request for a hearing on May 7, 2012 (Docket No. 12, p. 129 of 452).  On November 2,

2012, Administrative Law Judge (ALJ) Susan G. Giuffre presided over a hearing in Cleveland, Ohio, at which

Plaintiff, represented by Paula Goodwin,  appeared and testified.    Vocational Expert (VE) Jeffrey Joy

participated by telephone (Docket No. 12, p. 30 of 452).   The ALJ issued an unfavorable decision on January

2, 2013 (Docket No. 12, pp. 15-23 of 635).  The Appeals Council denied review of the ALJ's decision on May

15, 2014, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 5 of 452).

## III. FACTUAL BACKGROUND

### A.    ADMINISTRATIVE HEARING

### 1.    PLAINTIFF'S TESTIMONY

Plaintiff testified that he is 54 years old and that his alleged onset of disability date is June 7, 2011

(Docket No. 12, pp. 33; 40 of 452).  Plaintiff indicated that he is a high school graduate, has taken some general

business classes at a local community college, but did not complete a degree (Docket No. 12, pp. 33-34 of 452).

During high school, Plaintiff testified that he attended a vocational school for the 11th and 12th grades studying

diesel mechanics (Docket No. 12, p. 34 of 452).  Plaintiff reported that most recently he was self-employed as

a fence installer from August 2007 through June of 2011 (Docket No. 12, pp. 34-35 of 452). Prior to his work

installing fences, Plaintiff  trimmed trees for Owens Tree Service for a summer (three months) and explained

that he chose to leave the job due to the physical demands of the position (Docket No. 12, pp. 35-36 of 452).

Plaintiff also previously worked as a slitter operator for a steel processor, noting that the position involved lots

of physical labor, including standing all day and periodic lifting of up to 35 pounds related to setup of the parts of the machine that the steel runs through (Docket No. 12, pp. 36-37 of 452).

In response to the ALJ's question about the symptoms preventing him from work, Plaintiff testified that his shortness of breath is his biggest issue (Docket No. 12, p. 40 of 452).  Plaintiff described carrying 80-pound bags of concrete as a fence installer, explaining that after carrying one bag, he was required to stop and rest for 20 minutes (Docket No. 12, p. 40 of 452).  Plaintiff also indicated that anything long-term and physical, including walking around quickly causes him to slow down (Docket No. 12, p. 41 of 452).  Plaintiff estimated that he could walk less than a quarter of a mile, noting that he had difficulty getting off the train to come to the hearing (Docket No. 12, pp. 41-42 of 452).  Although Plaintiff indicated that there is no pain associated with his shortness of breath, he explained that he suffers from a little bit of dizziness when he overexerts himself (Docket No. 12, p. 42 of 452).  Plaintiff opined that lifting activities, such as helping a friend move a piece of furniture caused overexertion (Docket No. 12, p. 42 of 452).  To alleviate his shortness of breath symptoms, Plaintiff testified that he will stop and sit down, noting that depending upon the intensity of his symptoms, he may need to sit for 15 minutes before engaging in additional activity (Docket No. 12, pp. 42-43 of 452).  With respect to his arms and hands, Plaintiff complained of suffering from soreness caused by the different heart medications he takes, but reported that the pain was not extreme (Docket No. 12, p. 43 of 452).

During a typical day, Plaintiff watches a lot of television and plays board games with his father (Docket No. 12, p. 43 of 452).  When the ALJ inquired about whether Plaintiff performs household chores, Plaintiff responded that he does the cooking and usually places laundry in the washing machine, but that his father takes on a larger role with these responsibilities (Docket No. 12, pp. 43-44 of 452).  Plaintiff testified that his outside activities are limited to occasionally eating out and attending Alcoholics Anonymous meetings "pretty much every night" (Docket No. 12, pp. 44-45 of 452).  According to Plaintiff, he reported that he has remained sober

since December 20, 2009 (Docket No. 12, pp. 44-45 of 452).

On direct examination, Plaintiff indicated that he takes medications to control his blood pressure, cholesterol and improve blood flow. He also uses two different inhalers (Docket No. 12, p. 47 of 452). Plaintiff also provided details about his unsuccessful efforts to quit smoking tobacco, reporting that he now smokes less than a half pack of cigarettes a day and that his doctors are reluctant to prescribe the patch for him or other medications due to his heart issues (Docket No. 12, p. 47 of 452). Plaintiff also described his difficulties pushing, pulling, and bending related to his most recent employment as a fence installer (Docket No. 12, pp. 48-49 of 452).

### 2. VE TESTIMONY

Using the occupations listed in the DOT,[1] the VE described Plaintiff's past work as a flying-shear operator, DOT 615.682-010, as skilled work at a medium exertional level, with an specific vocational preparation (SVP)[2] of 5; fence erector, DOT 869.684-022, which the VE modified based upon Plaintiff's description of the work, classifying the position as semi-skilled work, with an SVP of 4, and performed at a heavy exertional level; and tree cutter, DOT 454.684-026, semi-skilled work, with an SVP of 3, performed up to a heavy exertional level (Docket No. 12, pp. 53-55 of 452).

The ALJ then posed her only hypothetical question to the VE, asking:

If you would assume then a person of the claimant's age, education, and past relevant work experience with the ability to perform light work activity; occasionally climbing ramps, stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing; occasionally stooping; occasionally kneeling; occasionally crouching; occasionally crawling, who would have to avoid

---

[1] Dictionary of Occupational Titles ("DOT")

[2] SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org. SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed. www.occupationalinfo.org.

concentrated exposure to extremes of heat and cold and who could avoid even moderate exposure to hazards defined as unprotected heights and industrial machinery.  Would such person be able to . . . perform any of claimant's past relevant work?

(Docket No. 12, p. 55 of 452).  After considering the hypothetical question, the VE indicated that  the person would be unable to perform any of Plaintiff's past relevant work (Docket No. 12, p. 55 of 452).  The ALJ next inquired as to whether such an individual would be capable of performing any other work (Docket No. 12, p. 55 of 452).  The VE responded affirmatively and provided the jobs of mailroom clerk, DOT 209.687-026, unskilled work, with an SVP of 2, performed at a light exertional level, having 2,000 jobs in the Ohio regional economy and 48,000 jobs within the national economy; routing clerk, DOT 222.687-022, with an SVP of 2, performed at a light exertional level, having 1,900 jobs in the Ohio regional economy and 68,000 jobs nationally and; counter clerk for photofinishing, DOT 249.366-010, with an SVP of 2, performed at a light exertional level, with an estimated 600 jobs in the Ohio regional economy and 17,000 jobs in the national economy (Docket No. 12, pp. 55-56 of 452).

On cross examination, Plaintiff's counsel requested that the VE  revisit the ALJ's hypothetical and add a limitation that the hypothetical individual not be on his feet for more than two to three hours during the course of an eight-hour shift and then asked whether such a limitation would impact the jobs the VE had provided (Docket No. 12, p. 56 of 452).  In response, the VE stated that such an individual would be unable to perform the mailroom clerk position, but would be capable of working as a routing clerk, however, it would require a reduction in the number of jobs for the position and make the position essentially a sedentary requirement and decreasing the available jobs to 550 in the Ohio regional economy and 22,000 in the national economy (Docket No. 12, pp. 56-57 of 452).  Plaintiff's counsel also asked the VE whether Plaintiff's existing job skills would be transferrable to sedentary work and the VE testified that none of Plaintiff's past work would be transferrable to sedentary work (Docket No. 12, p. 58 of 452).  Plaintiff's counsel then asked the VE to consider whether any

5

of the three jobs the VE cited would be affected by an additional limitation that the person cannot stoop, push or pull (Docket No. 12, p. 58 of 452).  The VE considered the hypothetical question and replied that none of the jobs he provided would meet the limitation (Docket No. 12, p. 58 of 452).  With respect to the counter clerk for photofinishing position, the VE explained that the position would be eliminated since it requires occasional stooping, while also noting that although the DOT does not characterize the mailroom and routing clerk positions as requiring stooping, based upon his experience, it is more likely that such a job does require some stooping as well as pushing and pulling (Docket No. 12, pp. 58-59 of 452).  The ALJ then followed up and asked whether in light of her first hypothetical question, any of Plaintiff's skills from his prior job experiences would transfer to light or sedentary level occupations (Docket No. 12, p. 61 of 452).  The VE answered that there are no such jobs at the light or sedentary levels, but that unskilled jobs exist  that do not require any transferability of skills (Docket No. 12, p. 61 of 452).

**B.  MEDICAL RECORDS**

Summaries of Plaintiff's medical records, to the extent they are necessary and relevant to the issues before this Court, follow.

**1.  CLEVELAND CLINIC**

- On June 7, 2011, Plaintiff complained of chest tightness and shortness of breath, which had persisted for two-to-three weeks and was getting progressively worse. On examination, Stacy L. Baumgartner, CNP, noted some scattered wheezing in Plaintiff's lungs and that his heart had an irregular rhythm.  The treatment notes reflect that an EMT was called and Plaintiff was transported to the hospital.  Plaintiff's assessment notes hypertension, irregular heart beat, tobacco use disorder, and substance abuse (Docket 12, pp. 285-287 of 452).

- On June 30, 2011, Plaintiff presented after having been hospitalized and complained of shortness of breath with exertion, which resolves with rest. Dr. Erica M. Roesch, M.D., diagnosed Plaintiff with sleep disturbance and recommended that he undergo a sleep study.  Plaintiff's assessment also notes Atrial fibrillation (A-fib), hypertension, tobacco abuse, substance abuse, which was stable, cardiomyopathy, and chronic obstructive pulmonary disease (COPD) (Docket No. 12, pp. 280-284 of 452).

6

- On July 7, 2011, Plaintiff complained that he had difficulty catching his breath that morning. Plaintiff reported that he had been going to work doing supervising jobs and that his energy had improved.  Dr. Roesch's diagnoses included hypertension, tobacco use disorder, A-fib, and cardiomyopathy (Docket No. 12, pp. 277-279 of 452).

### 2. TREATMENT RECORDS - MERCY REGIONAL MEDICAL CENTER

- On June 7, 2011, Plaintiff's discharge summary reflects a diagnosis at discharge of A-fib with rapid ventricular rate, elevated liver function tests, leukocytosis,[3] presumed COPD with sleep apnea, hypertension, and leukocytosis.  Plaintiff's medications at discharge were Lisinopril,[4] warfarin,[5] and metoprolol.[6]  Plaintiff was discharged home in stable condition on June 13, 2011 (Docket No. 12, pp. 299-300; 302-307 of 452).

- A report from a consultation with Dr. Jessica B. Wells, M.D., dated June 12, 2011 notes Plaintiff's history of present illness and background.  Plaintiff's list of medications included Aspirin, Diltiazem,[7] Romazicon, Lidocaine, lisinopril, metoprolol, and Betapace.[8]  On examination, Plaintiff was described as disheveled, having poor hygiene, but not appearing in any acute distress, and having a blood pressure of 140/101, and irregular heart beat.  Dr. Wells diagnosed Plaintiff with leukocytosis, likely polyfactorial (Docket No. 12, pp. 308-309 of 452).

- A treatment record from a consultation with Dr. Sastry Panchagnula, M.D., which is dated June 11, 2011, reflects that Plaintiff was evaluated for sleep apnea and hypoxia.  On examination, Plaintiff was described as obese, his oral cavity showing redundant soft tissue and a narrowed airway, and that he was having moderately decreased breath sounds.  An x-ray revealed some interstitial edema.  The medical impression lists obesity, notes that obstructive sleep apnea is

---

[3] Leukocytosis is an increase in the number of white blood cells in the blood. *Leukocytosis*, DICTIONARY.COM, (Dec. 30, 2014, 12:36 PM), http://dictionary.reference.com/browse/leukocytosis.

[4] Lisinopril is prescribed to treat high blood pressure. *lisinopril oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 12:39 PM), http://www.webmd.com/drugs/2/drug-6873/lisinopril-oral/details.

[5] Warfarin, which is the generic name for Coumadin is prescribed to treat blood clots. *warfarin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 12:41 PM), http://www.webmd.com/drugs/2/drug-3949/warfarin-oral/details.

[6] Metoprolol is used to treat high blood pressure and to prevent chest pain. *Metoprolol*, MEDLINEPLUS, (Dec. 30, 2014, 12:42 PM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html.

[7] Diltiazem which is a brand name for Cardizem is prescribed to patients to prevent chest pain. *Ditiazem oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 12:44 PM), http://www.webmd.com/drugs/2/drug-3783-276/diltiazem-hcl-oral/diltiazemtablet-oral/details.

[8] Betapace is prescribed to treat ventricular tachycardia (fast/irregular heart beats). *Betapace oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 12:55 PM), http://www.webmd.com/drugs/2/drug-9023/betapace-oral/details.

highly likely, Plaintiff's history of drug abuse, and opines that Plaintiff may have underlying COPD due to his history of smoking.  Dr. Panchagnula also indicated that Plaintiff's A-fib could be from his COPD, sleep apnea or drug abuse.  It was recommended that Plaintiff undergo a sleep study and check home O2 evaluation prior to discharge (Docket No. 12, pp. 314-315 of 452).

- A History and Physical Form completed by Dr. Martina Ferraro, D.O., and dated June 7, 2011, reflects that Plaintiff complained of shortness of breath and chest pain.  Dr. Ferraro opined, among other findings, that Plaintiff had chest pain-shortness of breath, probably secondary to A-fib with rapid ventricular response (Docket No. 12, pp. 316-318 of 452).

- On June 10, 2011, Plaintiff underwent a lexiscan myocardial perfusion stress test with Dr. Scott McCallister, M.D., which reflected that Plaintiff's results were abnormal, but that there was no evidence of ischemia or myocardial infarction.  The report otherwise notes moderate left ventricular dysfunction, an ejection fraction (EF) of 29% with anterior, anteroapical hypokinesia, and underlying A-fib with rapid ventricular rate.  A clinical correlation was advised, which Dr. McCallister opined suggests no ischemia or coronary artery disease.  Dr. McCallister also opined that a left ventricular function assessment may be falsely diminished given the A-fib and that an echocardiograph may be beneficial (Docket No. 12, p. 322 of 452).

- On June 15, 2011, Plaintiff underwent a pulmonary function test for shortness of breath, coughing, and wheezing.  Dr. Ashok P. Makadia, M.D. noted that Plaintiff has mild obstructive pulmonary disease, some response to brochodilator, static lung volume within normal range, diffusion capacity normal, and that clinical correlation requested (Docket No. 12, pp. 341; 345 of 452).

- On August 22, 2011, Plaintiff underwent an echocardiogram to check LV function for recurrent A-fib and flutter.  Dr. Philip Wendschuh, M.D. found Plaintiff's LV function to be normal with an estimated EF in the 55-60% range and that Plaintiff's right ventricular size and function appeared to be grossly normal.  Dr. Wendschuh opined that Plaintiff had mild to moderate left ventricular hypertrophy; mild to moderate 1 to 2+ mitral regurgitation and; mild to moderate, tricuspid regurgitation, among other findings (Docket No. 12, p. 332 of 452).

- A History and Physical form dated August 22, 2011, reflects that Dr. Ware evaluated Plaintiff for chest pain.  Dr. Ware's assessment of Plaintiff reflects that Plaintiff was admitted for recurrent chest pain; COPD exacerbated; leukocytosis; and tobacco dependence (Docket No. 12, pp. 338-340 of 452).

3.   **DR. GEETHA MOHAN, M.D.**

     a.     **OFFICE TREATMENT RECORDS**

- A report dated June 8, 2011, reflects that Dr. Mohan evaluated Plaintiff for A-fib and elevated troponins.  On examination, Dr. Mohan noted Plaintiff's breathing was significantly diminished throughout with expiratory wheeze scattered greater on the left over the right and that Plaintiff's heart beat was distant with irregular rhythm.  The assessment reflects A-fib with rapid ventricular

response, shortness of breath, and elevated troponins, among other findings. The treatment plan notes that Plaintiff's potassium and magnesium levels will be restored, his medication switched to Cardizem[9] for rate control, and that he would be initiated on Coumadin,[10] and Lovenox.[11] To treat Plaintiff's elevated troponins, Dr. Mohan noted that they would proceed with a perfusion study once Plaintiff's wheezing subsided and was able to proceed with the procedure (Docket No. 12, pp. 310-313 of 452).

- On June 9, 2011, Plaintiff underwent an electrical cardioversion with Dr. Mohan, which was unsuccessful. Plaintiff was placed on antiarrhythmic therapy and it was noted that the procedure would be repeated if the Plaintiff did not convert spontaneously (Docket No. 12, pp. 319; 381 of 452).

- On June 13, 2011, Plaintiff underwent another electrical cardioversion with Dr. Mohan, which was also not successful. The treatment plan reflects that the goal was for rate control, that Plaintiff would be discontinued on sotalol, continued on warfarin, and have an outpatient Holter monitor to examine the adequacy of Plaintiff's heart rate control (Docket No. 12, pp. 320; 380 of 452).

- On July 5, 2011, Plaintiff was evaluated by Dr. Mohan after having been seen during a recent hospital stay for A-fib with rapid ventricular response and hypertensive urgency. It was noted that Plaintiff's blood pressure had been resistant to multiple medications, that electrical cardioversion had been unsuccessful on three occasions, that Plaintiff's blood pressure remained markedly elevated, and that he complained of fatigue and shortness of breath. Dr. Mohan's assessment notes hypertension, and suggests an anterior apical fixed perfusion defect, among other findings. Dr. Mohan's recommended increasing Plaintiff's lisinopril medication, starting him on hydrochlorothiazide (HCTZ) and amiodarone, and having a basic metabolic profile conducted (Docket No. 12, pp. 376-378; 418-420 of 452).

- On July 20, 2011, Plaintiff reported that he was trying to cut back on nicotine, had not experienced any chest discomfort, shortness of breath, palpitations, lightheadedness, presyncope or syncope. The treatment notes reflect that Plaintiff was on amiodarone, his resting heart rate was 79 beats per minute, his ECG showed A-fib, and he had an elevated blood pressure of 142/90. Dr. Mohan's assessment included hypertension and A-fib. Dr. Mohan's recommendations included starting Plaintiff on aldactone[12] medication, continuing him on

---

[9] *See* Diltiazem, *supra* note 7, at 7.

[10] *See* Warfarin, *supra* note 5, at 7.

[11] Lovenox is prescribed to help reduce the risk of deep vein thrombosis and potential pulmonary embolism. *Lovenox*, (Dec. 30, 2014, 1:08 PM), http://www.lovenox.com/.

[12] Aldactone is prescribed to treat high blood pressure. *Aldactone oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 1:10 PM), http://www.webmd.com/drugs/2/drug-6671/aldactone-oral/details.

amiodarone, and having baseline pulmonary function studies for amiodarone surveillance (Docket No. 12, pp. 372-375; 414-417 of 452).

• On August 22, 2011, saw Dr. Mohan and complained of chest pain that morning, which was relieved with nitroglycerin. Dr. Mohan opined that Plaintiff may benefit from cardiac catheterization. The medical impression notes Plaintiff's history of A-fib, hyperlipidemia, hypertension, COPD, and tobacco abuse. The treatment plan indicates that Plaintiff would obtain an echocardiogram and undergo a cardiac catheterization  (Docket No. 12, pp. 334-337 of 452).

• On August 24, 2011, Plaintiff underwent a cardiac catheterization with Dr. Mohan. The treatment record reflects that Plaintiff has uncontrolled hypertension despite multiple medications and that the source of his chest pain was somewhat difficult to pinpoint, but a myocardial infarction was ruled out. Dr. Mohan noted that an echocardiogram showed no evidence of pericardial effusion and recommended that Plaintiff has an ongoing risk factor, that he undergo very aggressive blood pressure management, and would benefit from restoration of sinus rhythm (Docket No. 12, pp. 292-295; 367-370; 409-413 of 452).

• On September 28, 2011, Plaintiff complained of exertional shortness of breath with activities such as going up a flight of stairs. Among her findings, Dr. Mohan noted that Plaintiff has hypertension and a normal Carbon Monoxide Diffusing Capacity (DLCO), which would be monitored for evidence of amiodarone toxicity. Dr. Mohan recommended Plaintiff continue his current medications, added 5 milligrams of amlodipine, and indicated that Plaintiff would undergo another electrical cardioversion (Docket No. 12, pp. 360-363; 402-405 of 452).

• On November 22, 2011, Plaintiff's ECG was noted as showing sinus bradycardia at 58 beats per minute, but that he reported no cardiac symptoms. Dr. Mohan's assessment reflects A-fib; sinus bradycardia related to medications; increased corrected QT interval (Qtc.)[13] related to amiodarone, exacerbated by bradycardia; long-term warfarin anticoagulation; and chronic kidney disease. Dr. Mohan's recommendations include decreasing Plaintiff's metoprolol, and amiodarone, medications, increasing his amlodipine besylate,[14] and having Plaintiff follow up in two weeks (Docket No. 12, p. 395-401 of 452).

• On January 4, 2012, Plaintiff reported feeling well, having very infrequent transient lightheadedness with sudden changes in posture, borderline low blood pressure, and it was noted that Plaintiff continued to smoke despite being counseled to quit. Dr. Mohan's assessment lists hypertension on multiple medications and A-fib among her findings. Dr. Mohan recommended Plaintiff discontinue amlodipine, and follow-up in four to six weeks (Docket No. 12, pp. 390-394

---

[13]  The Corrected QT Interval (Qtc) is a corrected interval for heart rate extremes. *See Prolongation of Qtc interval and Risk of Stroke*, U.S. NAT'L LIBRARY OF MED. NAT'L INST. OF HEALTH, (Jan. 5, 2015, 2:39 PM), http://www.ncbi.nlm nih.gov/pmc/articles/PMC3345207/.

[14]  Amlodipine besylate, which is also known by its brand name Norvasc, is prescribed to treat high blood pressure. *Amlodipine oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 1:12 PM), http://www.webmd.com/drugs/2/drug-5891/amlodipine-oral/details.

of 452).

- On February 9, 2012, Plaintiff reported doing well, that his dizziness had improved with the discontinuation of amlodipine, but that his blood pressure was borderline low. Dr. Mohan's assessment for Plaintiff includes symptomatic A-fib/flutter, hypertension and chronic warfarin anticoagulation without obvious bleeding diathesis.  Dr. Mohan recommended Plaintiff discontinue hydrochlorothiazide, get a chest x-ray, and undergo liver testing (Docket No. 12, pp. 387-389 of 452).

- On August 9, 2012, Plaintiff reported feeling well and denied chest pressure, heaviness, palpitations, lightheadedness, presyncope, or syncope.  It was noted that Plaintiff had recently treated with Dr. Rae. Plaintiff's assessment reflects hypertension, a history of A-fib, and mild obstructive pulmonary disease, among other findings.  Dr. Mohan recommended Plaintiff undergo additional blood work, discontinued Plaintiff's warfarin medication and increased his aspirin dosage (Docket No. 12, pp. 449-451 of 452).

  **b.** **BASIC MEDICAL STATEMENT**

A Job and Family Services Form signed by Dr. Mohan notes the date of her last examination of Plaintiff was September 28, 2011.  Plaintiff's diagnoses note hypertension, on high risk medications, ongoing nicotine usage, chronic shortness of breath, all of which were initially noted in June 2011.  According to Dr. Mohan, Plaintiff's mood is good/stable, that Dr. Mohan's evaluation is strictly related to Plaintiff's cardiovascular system and that Plaintiff has undergone four electrical cardioversions in four weeks, surveillance testing for warfarin, amiodarone, and blood pressure medications.   Dr. Mohan opined Plaintiff's ability to stand and walk are affected by his impairment, noting that Plaintiff can stand/walk approximately one-to-two hours during a normal eight-hour workday and can sit between six and eight hours during a normal workday.  According to Dr. Mohan, Plaintiff can lift/carry between six and ten pounds frequently, and can occasionally lift/carry 21 to 25 pounds.

 Dr. Mohan assessed Plaintiff a moderate limitation for reaching, and marked limitations in bending and reaching.  The form notes that the examination and evaluation only pertain to cardiovascular evaluation and that Plaintiff's shortness of breath is limiting and that Plaintiff has a high risk of bleeding if injured.  Plaintiff's medical conditions are listed as HBP, A-fib, and COPD.  Plaintiff's medications include Amiodarone HCL, Amlodepine, Hydrochloriaude, Lisinopril, and metoprol tartrate (Docket No. 12, pp. 432-434 of 452).

4. **OFFICE TREATMENT RECORDS - NORTH OHIO HEART CENTER, INC.**

- On June 20, 2011, a Holter Report for Plaintiff reflects that his basic rhythm was A-fib throughout, that Plaintiff showed rare premature ventricular contractions, non-sustained, no significant supra ventricular ectopy, no evidence of a high-degree block or excessive pauses, and he had ST-T wave changes of varying depth. Dr. Wendschuh's assessment reflects A-fib throughout, and ST-T wave changes (Docket No. 12, p. 379; 421 of 452).

- On September 21, 2011, Plaintiff underwent an echocardiogram with Dr. Ted R. Pacheco, MD, FACC, which concluded, in relevant part, that Plaintiff had moderate concentric left ventricular hypertrophy and overall hyperdynamic left ventricular systolic function with estimated EF of 75 to 80% (Docket No. 12, pp. 364-366; 406-408 of 452).

- On December 7, 2011, Plaintiff reported shortness of breath with more strenuous exertion, long-standing history of tobacco use, but denied any dizziness or chest pain symptoms or that his heart felt differently from the previous month. The record reflects that Plaintiff's amiodarone and metoprolol medications would be decreased (Docket No. 12, pp. 395-398 of 452)

5. **OFFICE TREATMENT RECORDS - LORAIN COUNTY HEALTH & DENTISTRY**

- On May 29, 2012, Plaintiff had an appointment to establish care for hypertension. Dr. Evan Rae's, D.O. assessment of Plaintiff reflects hypertension, unspecified, A-fib, and unspecified hyperlipidemia. Dr. Rae recommended Plaintiff undergo blood testing, started Plaintiff on HCTZ, and continued his lisinopril, lipitor, Coumadin, ASA, and amiodarone medications (Docket No. 12, pp. 435-439 of 452).

- On June 1, 2012, Plaintiff had a follow up with Dr. Rae and it was noted that Plaintiff had not gotten the laboratory testing completed as recommended. Plaintiff reported being compliant with his medications, averaging low 180s for his blood pressure, complained of chronic blurred vision and a rash that itched. Dr. Rae's assessment of Plaintiff included hypertension, A-fib and scabies. Plaintiff was started on amlodipine, and permethrin[15] cream, and continued on HCTZ, metoprolol, and lisinopril (Docket No. 12, pp. 440-443 of 452).

- On August 25, 2012, Plaintiff underwent a pulmonary function test at the request of Dr. Rae for shortness of breath, a cough, and wheezing. Dr. Ashok P. Makadia, M.D. concluded that Plaintiff has mild obstructive pulmonary disease, mildly impaired diffusion capacity, increased airway resistence and he requested correlation (Docket No. 12, pp. 446-447 of 452).

---

[15] Permethrin is a topical medication used to treat scabies. *Permethrin topical: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 1:13 PM), http://www.webmd.com/drugs/2/drug-5964- 8063/permethrin-top/permethrincream-topical/details.

12

**C.**     **OTHER EVIDENCE**

The record in this case also contains witness letters from Mr. Gerald Boyle, Plaintiff's father, and Graig Astorino, Plaintiff's friend (Docket No. 12, pp. 424-431 of 452).

**IV. STANDARD OF DISABILITY**

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014). At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing *Abbott*, 905 F.2d at 923). At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014). If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a) (West 2014). In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014). At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014). Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West

13

2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014). While the claimant has the burden of proof for steps one through four, the Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

### V. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Giuffre made the following findings:

1.   Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015.

2.   Plaintiff has not engaged in substantial gainful activity since June 7, 2011, the alleged onset date.

3.   Plaintiff has the following severe impairments: recurrent arythmias, history of poly substance abuse in remission, chronic obstructive pulmonary disorder, obesity, and hypertension.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, ALJ Giuffre found that Plaintiff has the residual

14

functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b) except that he is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps or stairs. In addition, Plaintiff is unable to engage in climbing involving ladders, ropes, or scaffolding. Lastly, Plaintiff should avoid concentrated exposure to extreme temperatures and avoid even moderate exposure to hazards such as unprotected heights and industrial machinery.

6.  Plaintiff is unable to perform any past relevant work.

7.  Plaintiff was born on May 11, 1958 and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8.  Plaintiff has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

10. Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11. Plaintiff has not been under a disability as defined in the Social Security Act from June 7, 2011, through the date of this decision.

(Docket No. 12, pp. 15-23 of 452).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Miller*, 2014 WL 916945, at *3 (*quoting* 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402

U.S. 389, 401 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance." *Miller*, (*quoting Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"  *Cole*, 661 F.3d at 937 (*quoting Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence and argues that the ALJ erred by (1) not giving the limitations assessed by Dr. Mohan, his treating cardiologist, controlling weight; (2) not providing good reasons for rejecting Dr. Mohan's opinions and; (3) finding Plaintiff's statements not credible (Docket No. 13).  In his Reply, Plaintiff contends that there is no evidence that Plaintiff continued to work as a fence installer beyond July 1, 2011 (Docket No. 15).

### B.    DEFENDANT'S ALLEGATIONS

Defendant maintains that the ALJ reasonably discounted Dr. Mohan's opinions because they did not adequately describe how Plaintiff's impairments caused the alleged limitations and the opinions conflicted with Plaintiff's ongoing work activity (Docket No. 14, pp. 8-10 of 14).  Defendant also contends that the Plaintiff has not established that the ALJ committed reversible error with respect to the ALJ's credibility determination of Plaintiff (Docket No. 14, pp. 11-12 of 14).

C.    ANALYSIS

1.    DR. MOHAN'S OPINIONS

Plaintiff's arguments concerning the ALJ's analysis of Dr. Mohan's opinions and the weight she attributed them concerns the treating physician rule.

a.    TREATING PHYSICIAN RULE

Federal regulations prescribe certain standards an ALJ must comply with in assessing the medical evidence contained in the record.  The treating physician rule is one such standard and requires that a treating source's opinion be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*quoting Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)); *Blakley*, 581 F.3d at 406; see also SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996). The regulations define a treating source as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had an ongoing treatment relationship with you." 20 C.F.R. § 416.902 (West 2014).   The physician, psychologist, or other acceptable medical source must treat the claimant "'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)(*quoting Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). The treating physician rule stems from the belief that a claimant's treating physicians are best positioned, as medical professionals, to provide a detailed picture of the claimant's impairment and can provide a unique perspective that might not otherwise be obtained from the objective evidence or other reports of examinations. *See* 20 C.F.R. § 404.1527(c)(2) (West 2014).

Where a treating physician's opinion is not given controlling weight, there remains a rebuttable presumption that such opinion is entitled to great deference. *Rogers*, 486 F.3d at 242 (citation omitted).  To reject

a treating physician's opinions an ALJ must provide "good reason" for doing so in their decision to make it sufficiently clear to "subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2P, 1996 WL 374188, *5). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where the claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he or she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (citation omitted). To comply with the obligation to provide good reasons for discounting a treating source's opinion, the ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record; (2) identify evidence supporting such finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Allums v. Comm'r*, 2013 WL 5437046, *3 (N.D.Ohio 2013) (citing *Wilson*, 378 F. 3d at 546). Those factors require the ALJ to consider the length, frequency, nature and extent of the treatment relationship, the evidence the medical source presents to support their opinion (supportability), the consistency of the opinion with the record as a whole, the specialization of the opinion, and any other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2) (West 2014). Most recently, in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013), the Sixth Circuit noted that there are two distinct analysis in evaluating a treating-source relationship under 20 C.F.R. § 404.1527(c)(2), finding that the ALJ must first determine whether a treating source opinion will be given controlling weight before applying each of the seven factors set forth under the statute. *Id.*; *see also* 20 C.F.R. § 416.927(c)(2) (West 2014).

### b. ALJ'S FINDINGS & ANALYSIS OF DR. MOHAN'S OPINIONS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In this case, the ALJ's analysis of Dr. Mohan's opinions do not comply with the requirements of 20

C.F.R. § 416.927(c)(2) since the ALJ failed to articulate whether Dr. Mohan's opinion was classified as a treating or non-treating examining source opinion prior to assessing the opinion little weight. *See Gayheart*, 710 F.3d at 376 ("The source of the opinion therefore dictates the process by which the Commissioner accords it weight."). The ALJ's initial classification of Dr. Mohan's opinion was determinative of the weight, that the opinion should have been afforded pursuant to § 416.927(c)(2), and the analysis and reasoning required in order to appropriately discount that opinion. *See* 20 C.F.R. 416.927(c)(1)(West 2014)("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); 20 C.F.R. § 416.927(c)(2) (West 2014)("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. . . . When we do not give the treating source's opinion controlling weight . . . We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). In addition to providing "good reasons" for discounting a treating source opinion, an ALJ is also required to *explain* his or her application of the 20 C.F.R. § 416.927(c)(2) factors, whereas the ALJ is only required to *consider* such factors in evaluating the weight to afford any other medical opinion. *Wilson*, 378 F.3d at 546; 20 C.F.R. § 416.927(c), (c)(2) (West 2014); SSR 96-2p, 1996 WL 374188 (July 2, 1996)(emphasis added). The ALJ must also make his or her reasoning sufficiently clear to allow for meaningful judicial review. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).

The ALJ's decision frustrates meaningful judicial review in this case. Before Dr. Mohan rendered her opinions contained in the report dated September 28, 2011, the record reflects that she treated Plaintiff on seven occasions (Docket No. 12, pp. 310-313; 319-320; 292-295; 376-378; 372-375; 360-363 of 452). Although the ALJ's decision references and cites to some of Dr. Mohan's treatment records, it is unclear whether the ALJ considered Dr. Mohan as a treating or examining source in her analysis. Without knowing the ALJ's

19

classification of the treating relationship between Dr. Mohan and Plaintiff, the undersigned Magistrate cannot be certain of whether the ALJ's findings are supported by substantial evidence.  Defendant suggests that the ALJ analyzed Dr. Mohan's opinion as that of a treating source, but even assuming that were true, the ALJ's analysis does not comply with the requirements set forth in the regulations for discounting a treating source opinion (Docket No. 14, p. 8 of 14).

The ALJ acknowledged in her decision that Dr. Mohan specializes in cardiology, summarized the limitations Dr. Mohan assessed Plaintiff, before determining that Dr. Mohan's opinions should be given little weight.  In support of her finding, the ALJ reasoned that Dr. Mohan had failed to describe how Plaintiff's impairments result in the limitations Dr. Mohan assessed and because Plaintiff's ongoing work installing fences indicates activities of daily living that exceed Dr. Mohan's opinions (Docket No.12, p. 20 of 452).  Putting aside for the moment whether the ALJ had a proper basis for rendering such a conclusion, the ALJ's reasoning appears to address the specialization, supportability, and consistency factors set forth in 20 C.F.R. § 416.927(c)(3)-(5), but as the Sixth Circuit made clear in *Gayheart*, "these factors are properly applied only after the ALJ has determined that a treating source opinion will not be given controlling weight." *Gayheart*, 710 F.3d at 376.  The ALJ's analysis in this case does not provide any reasoning about whether or not Dr. Mohan's opinions should be given controlling weight, instead skipping to addressing some, but not all of the 20 C.F.R. § 416.927(c)(2) factors.  For example, the ALJ failed to make a finding and provide sufficient reasoning that Dr. Mohan's opinions are not well-supported by medically acceptable clinical and laboratory diagnostic techniques and inconsistent with the other substantial evidence of the record. *See* 20 C.F.R. § 416.927(c)(2) (West 2014).  The Sixth Circuit has repeatedly held, in order to comply with the reason giving requirements of 20 C.F.R. § 416.927(c)(2), an ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record; (2) identify evidence supporting such finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the

weight that should be given to the treating source's opinion. *Allums v. Comm'r*, 2013 WL 5437046 at *3 (citing *Wilson*, 378 F. 3d at 546).

"It is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson*, 378 F.3d at 545.  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole v. Astrue*, 661 F.3d 931, 939-40 (6th Cir. 2011)(*quoting Blakley*, 581 F.3d at 407 (internal quotation marks omitted).  Since the ALJ in this case has failed to assess the medical source opinion evidence in accordance with the Agency's regulations, the ALJ's decision is not supported by substantial evidence.

Accordingly, the undersigned Magistrate recommends this Court find the ALJ's findings and analysis concerning Dr. Mohan are not supported by substantial evidence.

## 2. THE ALJ'S FINDINGS CONCERNING PLAINTIFF'S ONGOING WORK ACTIVITIES ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff also challenges the ALJ's findings concerning his credibility and argues that there is no evidence that he continued working installing fences beyond July 1, 2011 (Docket No. 13, p. 12 of 18; Docket No. 15, p. 2 of 3).  Defendant disputes Plaintiff's assertion and contends that there is evidence that Plaintiff was working in July and September 2011 (Docket No. 14, p. 10 of 14).  In support of its contention, Defendant first cites to a medical record from Dr. Roesch, which is dated July 7, 2011 and reflects that Plaintiff reported going to work doing supervising jobs (Docket No.14, p. 10 of 14; Docket No. 12, p. 277 of 452).   Defendant also cites a medical record from Dr. Mohan, dated September 2011, which indicated that Plaintiff was finding it hard to work (Docket No. 14, p. 10 of 14; Docket No. 12, p. 360 of 452).

Plaintiff misconstrues the limited purpose under which an ALJ may properly consider a claimant's credibility.  "In evaluating complaints of pain, an ALJ may properly consider the credibility of the claimant." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)(citing *Kirk v. Sec'y of Health & Human*

21

*Servs.,* 667 F.3d 524, 538 (6th Cir. 1981)).  "[A]n ALJ's findings based on the credibility of the [claimant] are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters*, 127 F.3d at 531 (citing *Villarreal v. Sec'y of Soc. Sec.*, 818 F.2d 461, 463 (6th Cir. 1978)).  The "ALJ's assessment of a claimant's credibility must be supported by substantial evidence."*Ridge v. Barnhart*, 232 F.Supp.2d 775, 790 (N.D. Ohio 2002).

Here, the ALJ's findings, with respect to Plaintiff's ongoing work activities, include citations to the record and appear to be based upon her interpretation of the record.   In the section of the ALJ's decision summarizing the evidence, the ALJ asserts that "[t]he claimant has indicated that he continues to smoke despite his health issues and has worked installing fences since the alleged onset date in a self-employed capacity" (Docket No. 12, p. 19 of 452).  To support her assertion, the ALJ cites an Outpatient Form from Mercy Regional Medical Center dated August 24, 2011, a Consultation Report with Dr. Mohan dated June 8, 2011, and a Pain Questionnaire completed by Plaintiff and dated September 21, 2011 (Docket No. 12, pp. 290; 310-313; 217-220 of 452).  The Outpatient form includes a notation in two different places, which specifies that Plaintiff is self-employed as a sub-contractor, but does not otherwise contain any other reference or detail concerning Plaintiff's work (Docket No. 12, p. 290 of 452).  The Consultation Report and Pain Questionnaire, both of which are also cited by the ALJ, do not contain any additional information concerning Plaintiff's work activities (Docket No. 12, pp. 310-313; 217-220 of 452).  The ALJ again cites Plaintiff's ongoing work activity installing fences in her decision as a basis for giving Dr. Mohan's opinions little weight in her analysis (Docket No. 12, p. 20 of 452).

Although Defendant's Brief accurately summarizes two records from July and September 2011, which both suggest that Plaintiff was working beyond his alleged onset date, the ALJ's decision does not identify or cite to this evidence in her decision.  Thus, Defendant's arguments are essentially a post hoc rationalizations for ALJ's omissions.  The United States Supreme Court has recognized that "courts may not accept appellate counsel's post hoc rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)(citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

 "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency

itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463 U.S. at 50 (citation omitted).  Since the ALJ has not properly

supported her findings with respect to Plaintiff's ongoing work installing fences, the undersigned Magistrate

recommends that this Court find the ALJ's findings concerning Plaintiff's ongoing work are not supported by

substantial evidence.

## VIII. CONCLUSION

For the foregoing reasons, the undersigned Magistrate recommends this Court reverse the

Commissioner's decision and remand the case, pursuant to the fourth sentence of 42 U.S.C. § 405(g), for

further proceedings consistent with this Report and Recommendation.  On remand, the Commissioner should

re-evaluate Dr. Mohan's opinion, clearly articulate its classification of the opinion and engage in the

appropriate analysis consistent with the factors set forth in 20 C.F.R. § 416.927(c)(2).  The undersigned

Magistrate also recommends that the Commissioner re-assess the record concerning Plaintiff's ongoing work

as a fence installer and properly reference or cite to the applicable parts of the record, which supports such a

finding.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date: January 8, 2015

## IX.  NOTICE

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto

has been filed.  Pursuant to Local Rule 72.3(b), any party may object to a report and recommendation within

fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the

fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting part shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.